Per Judge Brown.
The questions presented for determination by this case are, first, is a judgment a lien oh the lands of the debtor; sec *24 ond, if a judgment be a lien on the lands of a debtor, in what manner may this lien be suspended or discharged; and, thirdly, if Porter’s judgment was not a lien, or that lien were by any means destroyed before the sale under his judgment, and if the sale to Thomas Cocke was fraudulent, whether he is not protected by the statute of limitations ?
By the common law, lands and tenements were not subject to be taken in execution at the suit of a common person, except in case of an heir; to remedy this obvious defect, came the 13th Ed. 1, ch. 18, by which it is provided, that when a debt is recovered or acknowledged in the king’s court, or damages awarded, it shall be from thenceforth in the election of him to have a writ that the sherifffieri facial of the lands and goods, or that the sheriff shall deliver to him all the chattels of the debtor, &c., and the one half of his land, until the debt be levied upon a reasonable price in extent. Upon this is founded the writ of elegit, by which all the goods of the debtor are delivered, at their approved value, into the hands of the creditor, and the one half of his lands are extended. There is nothing in this statute which indicates the time from which the land shall be bound, but by construction of the Court immediately after its enactment, and ever since, the judgment has been held to bind the land, and the plaintiff might have execution of the lands, which defendant had at the time of the judgment, although he had aliened them bona fide before execution awarded. This construction was adopted the move effectually to secure the just rights of creditors, and its propriety and justice have never been questioned or rendered doubtful by the experience of centuries. This is the law which the colonists brought with them from the mother country, and is yet the law unless changed by statute. A short time was sufficient to convince the inhabitants of the Colonies, and those with whom they had commercial transactions, that the elegit was wholly insufficient, as a process, to enforce the payment of debts. Much of the lands held by debtors, was wild and uncultivated, and would be an annual incumbrance to the creditor, instead of procuring any annual profit. Such lands as were improved had no fixed or certain annual value, difficult to rent, and would probably produce nothing unless tile creditor would become the occupier, which was not often convenient. Thus, in fact, the lands of the debtor though of considerable intrinsic value, were totally beyond the reach of the creditor. Again, the progress of commerce, the gradual decline of feudal notions and principles, and a more enlightened view of the relative rights and duties of men, had shown, that no part of the debtor’s property should be withheld from the satisfaction of his debts. To aid the creditor by subjecting all the debtor’s real estate to legal process for the payment of debts, and to change the process, making such estate liable to sale instead of extent, was enacted by the statute of 5 Geo. 2, ch. 7, § 4, in these words: —
“ And be it further enacted by the authority aforesaid, that from and *25 after the 29th day of September, 1782, the houses, lands, negroes, and other hereditaments, and real estate, situate or being within any of the said plantations, belonging to any person indebted, shall be liable to,, and chargeable with, all just debts, duties, and demands of what nature or kind soever, owing to any such person, to his Majesty, or any of his subjects ; and shall be assets for the satisfaction thereof in like manner as real estates are by the law of England liable to the satisfaction of debts due by land or other specialty; and shall be subject to the like remedies, proceedings, and process in any court of law or equity in any of the said plantations respectively, for seising, extending, selling, or disposing of any such houses, lands, negroes, and other hereditaments and real estate towards the satisfaction of such debts, duties, and demands, and in like manner as personal estate in any of the said plantations respectively, are seised, extended, sold, of disposed of for the satisfaction of debts.”
When examining this statute with a view to the determination of the present question, I admit it should be read as if the words “ and shall be assets for the satisfaction thereof, in like manner as real estates are by the law of England, liable to the satisfaction of debts due by bond or other specialty,” were not in the section, because they do most clearly relate to a different subject, to which the comparison there made is peculiarly, and "alone applicable, and thus far entirely agrees with the Supreme Court of North Carolina in the case of v. Murph. Rep.
The first provision in the section is, that all the lands, &c. of persons indebted, shall be liable to, and chargeable with, all just debts, &c. The last is; that the'lands, &c. shall be subject to be seised, extended, sold, or disposed of, by any process in any court, &c. in like manner as personal estates are seised, extended, sold, or disposed of for the satisfaction of debts.
It may now be remarked that the elegit is not taken away from the creditor by this statute, but on the contrary, is in express terms recognized and preserved.
If the first provision had stood alone, the effect would have been simply to subject all the debtor’s real estate to be extended under the elegit, and in that case it would not probably be contended by any one that the binding force of the judgment was affected; nor would it be denied that, taking the whole section as it stands, the judgment would bind the lands if the creditor elected to have the writ of elegit But it is argued that the last provision destroys the lien of the judgment if the party resorts to a sale of the land, and that when the fieri facias is applied to the sale of land by this section, all the incidents, effects, and consequences of the fieri facias which attend it when applied to the sale of personal property, are necessarily introduced; that such was the intention of the Legislature is evinced by their reference to the sale of personal estate; *26 that the fi. fa. only binds goods from the test, and therefore lands should only be bound from the test of the fi. fa. when it is used to subject them.
We will examine these objections, and to do this satisfactorily, we will see, first, whether there is anything in the statute of Westminster which creates this lien; second, if not, whether there is anything in the writ of elegit which produces this effect; third, why thefi.fa. only binds from the test, and the points in which the elegit andji./a. agree and differ, from all which we shall perceive upon what basis the lien of a judgment does rest, and whether the. fieri facias destroys that basis.
We have already seen that there are no express words in the stat. West, which indicates the binding effect of the judgment on lands; the same words are used with regard to goods and chattels as lands. It is true, in the writ of elegit now generally in use, the sheriff is directed to deliver such lands as the defendant was seised of on the day of the rendition of the judgment. This direction is only to inform the sheriff of the construction of law made upon the statute, and is merely a consequence of such construction; 7th Co. Rep. 131, Sellington’s case; for many writs of elegit are to be found in books of most approved authority where this direction is altogether omitted. Fitz. N. B. 594, (266 in mar.) 2 Saund. Rep. 68 ; and the forms of writs used in judicial proceedings, Lord Coke tells us, are only the evidence of what the law is, and do not make the law nor are the reasons of it. The writ in this case was framed to carry into effect the statute with such construction as the courts had given to it.
Now, we will examine whether the lien of the judgment has any dependence on the process used to execute it, or whether the form of the execution can so far retrospect upon the judgment as to confirm or destroy its force; for if it should'be found that the lien of the judgment in England does depend on the elegit, then the argument is fair to say, that when this writ is not used the lien is relinquished; but, if the lien of the judgment has no connection with the execution used, and depends upon other circumstances and reasons, then we may fairly conclude that the substitution of the fieri facias for the elegit was not intended, nor does destroy, the lien of the judgment.
The elegit directs the sheriff to deliver to the creditors all the goods and chattels of the debtor except oxen and beasts of the plough, and also a moiety of his lands and tenements.
Here, then, is the same execution directed against several species of property, and if the binding effect of this judgment depend on the writ, all will be bound in this case by the judgment. The lands are bound, yet it has been held by a series of adjudged cases from the year books down to this time, that the goods and chattels are bound in this case only from the test of the elegit. 1 Roll. Ab. 893 ; 8 Co. Rep. 171, Fleetwood’s case; 3 Atk. Rep. 200, Shilley v. Watts; Sug. on Ven. 474; Gilb. on Ev. 33. *27 Again, a term for years, may by the sheriff under an elegit, either be extended, that is, he may deliver a moiety thereof to the plaintiff under the words in the statute, medietatem terra suce; 2 Inst. 396; 8 Co. 171; Gilb. on Ev. 35, or may sell the whole term to the plaintiff as part of the personal, at a gross price approved by the jury. A term for years may also be sold at common law under a fieri facias. Now, this is a case which will most conclusively show whether the execution used has any effect upon the judgment, or creates or in any manner affects the lien. Here whether the elegit or thejfieri facias be issued, whether the term be extended or sold, the property is only bound from the time execution is awarded. Sug. on Ven. 494; 8 Co. 171; 3 Atk. Rep. 200. This was the common law with regard to the fen facias, and when the term was made extendible under the elegit, the change of process effected no change in the lien;, the fieri facias bound goods and chattels from its test, because they were goods and chattels, and an account of the nature of the property, and for this reason alone was it that the elegit was held to bind goods only from the test, and upon this reasoning was it held that a leasehold was not bound by the judgment, because it was a chattel, because it was goods; Sug. on Ven. 494, 5 ; and if the elegit binds to precisely the same extent with the fieri facias, when levied on personal estate, can any reason be given why the fieri facias when levied on personal estate should destroy the lien of the judgment when made to operate on freehold estate? I believe no reason founded on authority or justice can be rendered why it should have such effect, and by all just analogy, when the fieri facias is levied on freehold estate, then it should, as the elegit does, conform itself in its operation to the nature of the property brought within its reach, 2 Bac. Ab. 700 ; 2 Roll. 472, and should truly execute the judgment to such extent as it operates upon the rights and property of the respective parties to it. Therefore I conclude as the writ of execution employed has, in the cases adduced, had no effect either to extend or limit the binding force of the judgment, that when the act of 5 Geo. 2, ch. 7, § 4, gave to the creditor the right to sell the debtor’s land under the fieri facias instead of extending it under the elegit, it was not intended by a change of process to change and limit the effect of the judgment.
The whole statute is made to extend the rights of the creditor to secure to him the power of collecting his debt; and it would be singular indeed, if, at the time the Legislature gives to the creditor the benefit of the fieri facias upon lands, it intended to annex a condition to its use which might, and in many cases would, altogether defeat the collection of his debt.
The uniform course of judicial dicta, coming from judges of considerable learning and experience, although not' amounting to authority, are yet entitled to much respect and tend to give greater confidence in the opinion *28 now expressed. By the Act of 1799, ch. 14, § 2, the Legislature of this State have recognized the binding force of a judgment on lands, and have so limited this lien as to prevent any serious injury to purchasers bona fide from the judgment debtor.
This lien, given by construction of law for the benefit and safety of the judgment creditor, may, by his act, and probably by other circumstances, be suspended or extinguished, -and in the present case we think it was at least suspended with regard to the junior judgment under which defendant claims.
Porter’s judgment was obtained at March term, 1808, of the-Court-execution issued returnable to September term following, the execution was returned levied on the tract of land in dispute, and stayed by injunction. At September term, 1808, the injunction was dissolved, and on the 4th day of October an agreement was made between the judgment debtor and the plaintiff’s attorney, by which in consideration of a payment then made in land to him, he agreed to suspend all further proceeding on his judgment until the following March term, from which the venditioni exponas issued upon which the sale was made to the lessor of the plaintiff.
At May term, 1808, of the County Court of the same county, judgment was obtained by Yancy against William Cocke, upon which execution issued on the 12th day of November, 1808. The latter judgment was proven to be founded on a debt fairly due and owing from William Cocke to the judgment creditor.
When the law, by construction, extended to the prior judgment a lien and a right to be first satisfied, it intended this favor to be pursued with diligence on the part of the person favored, and with as little injury or delay to other creditors as practicable. It is a lien like all others, raised by construction of law which may be lost by the laches of the prior judgment creditor.
If the plaintiff by a contract with the debtor may delay the collection of his debt for six months and still retain his lien, to what period of time might he not extend it, and if he could extend it indefinitely, an injury and injustice would be committed toward the other creditors which never could have been within the contemplation of law when this lien was created. It would be unreasonable and unjust to allow such delay and such disregard of the rights of others, and courts both of law and equity in analogous cases have discharged the lien or security upon the ground of negligence.
In Payne v. Drewe, 4th East. Rep. 523, the Court of King’s Bench determined that a sequestration of-of chancery, which bound the goods of the. person against whom it was directed, had lost its priority by reason of the laches of the sequestrators in delaying to execute the-writ *29 for eighteen months. Here then was no contract for delay, but simply a neglect to enforce the priority; and Lord Ellenborough puts it upon the principle of public convenience and the prevention of fraud and vexatious delay.
In the case of Kempland v. Mc’Cauley et al., Peak’s N. P. Cas. 65, execution came first to the sheriff’s hand, which gave it a priority, but afterwards the plaintiff’s attorney directed the sheriff not to levy until a future day, before which day another creditor’s execution came to his hands. Lord Kenyon was of opinion that if the plaintiff directs his execution not to be' levied before a distant day, and in the mean time another execution comes to his hands, the sheriff is not to keep the first writ hanging over the heads of the other creditors, but is to levy under the last writ as if no other had "ever been delivered to him.
Now the principle of these cases applies directly and irresistibly to the one before the Court. In the often agitated and well settled question with regal'd to what acts of the creditor will discharge a security, the same principle is adopted and enforced in cases by no means less favorable to the creditor than this case. The present rule as laid down by Lord Eldon is, “ that if a creditor without the consent of the security, gives time to the principal debtor, by so doing he discharges the surety, that is if time be given by positive contract, even though such delay were manifestly for the benefit of the surety”; 3 Mer. Rep. 278, Samuel v. Howarth; and the principle upon which this rule is adopted is because such stipulated delay may prove injurious to the surety, and place him in a different situation from that contemplated in the original contract.
The lien allowed by law to the first judgment is certainly not more fixed and obligatory than the lien, if the expression may be used, or the obligation arising from express contract is upon the surety. They are both securities for the payment of the debt, the one raised by contract, the other by legal construction. By any improper delay by contract, the younger judgment creditor is not less liable to injury in the first case, than the security in the latter; the younger judgment creditor whose rights are postponed to the prior judgment creditor without any act or assent of his, stands on quite as high and favorable ground in every respect as a surety who has voluntarily, and by his own act, come under an express obligation to pay the debt if his principal does not. Yet in the last case, a ddfay given by contract discharges the security ; and we think upon a principle of equity clear and strong, and substantially the same; that a delay given by contract to the judgment debtor discharges the lien of the judgment so far as regards younger judgment creditors who stand in a situation to be delayed or injured by such postponement.
We do not pretend to say what particular length of delay by contract will have this effect; but we say that when by contract the judgment *30 creditor agrees to suspend all proceedings on his judgment from one term of the Court till the next, his lien is suspended with regard to other judgment creditors.
But the plaintiff says that the purchase by Thomas Cocke was fraudulent and void as to him, and that he acquired a title by the subsequent sale, although his judgment may have lost its priority; this makes it necessary for the Court to decide the last question in the case, that is whether the defendant is protected by the statutes of limitation of 1715 and 1797.
That Cocke, the defendant, had been more than seven years in possession before the commencement of this action, was proved upon the trial and is stated in the record, and it does not appear, nor is it pretended that the lessor of the plaintiff was at any time during that period, laboring under any of the disabilities mentioned in the saving clauses'of these statutes; and it will only be necessary then to inquire, —
First, whether the defendant had such a title and possession as would enable him to claim the protection of the statutes of limitation against any person; and
Secondly, whether the plaintiff had during that period, such a title or claim, or demand as could be barred by the operation of these statutes.
Thomas Cocke purchased at one entire sale on the 12th day of November, 1808, went into exclusive possession some time in the winter of 1808 — 9, and on the 30th day of August, 1809, received a deed from the sheriff. This suit was commenced on the 17th day of August, 1816.
To this title and possession with reference to the question, several objections are offered.
First, that the defendant had not a deed for seven years before suit brought.
Secondly, that this deed is void on account of the fraudulent purchase, and therefore the statutes will not protect him.
Thirdly, that defendant acquired the title by fraud, and therefore the statute will not run in his favor; and
Lastly, that his possession was not adverse till he received a deed from the sheriff, and therefore not seven years possession.
When the deed was made by the sheriff, it related back to the time when the sale was made, and vested the title from that time; 1st John’s. Cas. 85, Jackson v. Raymand; 15th John’s. Rep, 315, Jackson v. Dickinson; Den on the demise of B. M. Garner v. Elizabeth Johnston, determined by this Court at Columbia.
The statute of 1797, ch. 43, § 4, requires that the person claiming its benefit “ shall have had seven years peaceable possession,” “ by virtue of a grant or deed of conveyance founded on a grant ”; and when the deed is executed and by law it has relation to the sheriff’s sale and passes the title *31 from that time, then the intermediate possession is by the most rigid construction held by virtue of this deed.
In answer to the second objection, without entering into the question so long contested, whether a deed simply and wholly void will constitute a link in the chain of title sufficient to satisfy the words in the statute “ founded on a grant,” we can with confidence say this is such a deed as will protect the possessor claiming under it, and that no judicial opinion has ever been given affirming any principle in conflict with that now expressed. The- deed in question, suppose it were fraudulent against creditors or purchasers, is yet a good and valid conveyance for many purposes; it was made by one who had power to make it; was good ah initio against William Cocke and all other persons except creditors and purchasers ; according to the better opinion, it is capable of confirmation; 9th Ves. 190, George v. Willbank; 4th Wheaton’s Rep. 487, Aster v. Wells ; 18th Johnston’s Rep. 523, Anderson v. Roberts.
The next objection is that there was fraud in the acquisition of this land, and therefore, the statute will not operate.
Upon this question there are to be found in the books many loose unmeaning dicta, and considerable misapprehension.
Fraud is not one of the exceptions contained in the statute of limitations; therefore, when Courts undertake to introduce an exception of this kind, they should be very sure that they are proceeding in accordance with the general intention of the Legislature, that they are not letting in some of the evils intended to be excluded, and there should be a definite and clear principle to guide them in the application of this new exception.
That the Legislature intended to bar all frauds which are the subject of an action on the case at law, would be impossible to deny; and if a proposition so evident of itself needed authority, many cases could be resorted to in its support, some of which will be presently noticed.
Three classes of cases connected with this question have been presented ; when the cause of action is founded on a fraud committed; when the cause of action is founded on a fraud, the facts of which did not come to the party’s knowledge until within the time of limitation, and when the cause of action has been by fraud concealed from the party’s knowledge, or he has been by fraud delayed or prevented from commencing his suit until the time of limitation has elapsed.
To the first class of cases no respectable adjudged case has been found in which it was determined that the statute of limitations did not apply. It would be a doctrine so fatal to the security of property and the repose of society, that it has been uniformly discountenanced by the ablest judges; in the case Beckford et al. v. Wade, 17th Ves. 88, Sir William Grant most explicitly declares that in a case of fraud, the party acquiescing shall be barred by the statute of limitations, and deprecates in the strongest *32 language, the idea that a man may he called on at any distant period of time, to examine a mass of complicated facts from which the existence of fraud is to be shown. Every reason which could exist in favor of the application of the statute to ordinary cases, applies with increased force to a case of this kind. A transaction which at the time it occurred, might be explained with great ease, and perfectly to the satisfaction of every person, by the lapse of time, the loss of papers, the death or forgetfulness of witnesses, might become entirely incapable of explanation. Barney v. Riagard, 1 Cox. Cas. in eq. 145 ; 1 Ves. 97. Lord Kenyon, when master of the rolls, on the sole ground of length of time, reversed a decree by which Sir Thomas Sewel had granted relief against a fraudulent purchaser; Lord Kenyon agreeing that the purchase was originally fraudulent, and that the defendant must have been held to be a trustee if the suit had been brought within proper time.
This last case has been recognized and acted on ever since in the Eng-iish courts of chancery.
In the opinion delivered by Lord Redesdale, in the case of Havenden v. Lord Annersly, 2 Sch. and Lef. 633, and which will remain as a monument of his transcendent ability, the true principles upon which the statutes of limitation operate in cases of fraud and trust, are clearly and correctly laid down, and are sanctioned by his successor, Lord Chancellor Mainers.
In the last case cited, it is said, “ that in a case where a person who is in possession by virtue of a fraud, is not in the ordinary sense of the word a trustee, but is to be constituted a trustee by a decree of a court of chancery founded on the fraud, and his possession in the mean time is adverse to the title of the person who impeaches the transaction on the ground of fraud,” then the statute will operate.
The case now under consideration belongs to this class. If there was any fraud, it was open and adversary at its commencement, and directly hostile to the claims of the present plaintiff; there was no concealment, and Porter seems never to have had his attention turned aside by any act of Thomas Cocke, from the prosecution of his right.
The objection which regards the nature of Thomas Cocke’s possession intermediate between the sale and the execution of the sheriff’s deed, will not, when considered, be found of great weight.
To constitute an adverse possession, two things only are necessary,— that there be an open and exclusive possession, and that the tenant claims, and intends to hold, for himself alone.
To this definition there might seem to be some exceptions, but upon examination they will be found to be cases where the law presumes and adjudges the possession to be held for another than the tenant, either in consequence of some character which the tenant sustains, or some relation which exists between him and some such other person.
*33 Now here was an open and exclusive possession held by Thomas Cocke, claiming to hold for himself. There was no contract between him and William Cocke which would destroy the adversary character of his possession, even with regard to him, much less with regard to any third person; and when the sheriff’s deed was executed and made him the legal owner from the commencement of his possession, then was his whole possession adverse to all persons in the world. 13 Johns. Rep. 120, Jackson v. Ellis; 12 Johns. Rep. 490, Jackson v. Foster.
Thus we come to the conclusion that the defendant’s title and possession are such as the statutes were intended to protect.
We will now examine whether the plaintiff’s claim was such as the statutes will bar.
It is argued, on the part of the plaintiff, that he had no legal right or title to enter upon those lands until the sheriff’s deed was made to him, which was on the 16th day of August, 1816, and that he entered and commenced suit on the next day after; that before this, and since the sale to him, his title was only equitable, and therefore could not he barred; and that before the sale he was only a judgment creditor, which was merely a power to sell the land and an encumbrance which could not be barred by time.
To so much of this argument as regards the nature of the plaintiff’s title from the sale on the 29 th day of August, 1809, to the date of the sheriff’s deed on the 15th day of August, 1816, two obvious answers exist; when the plaintiff did obtain his deed from the sheriff, his legal title related back to the sale, and if no such relation did take place, and his title during that time was only equitable, yet the statutes of limitation would bar it.
That the statute of limitations w'ill operate as a bar to equitable titles, is a principle which has been long settled by a train of well-considered decisions, and is also based upon reasons which must always secure its stability.
Trusts and other equitable titles and demands, it is admitted, do not come within the words of most statutes of limitations ; but it does not thence follow that they are not virtual!}' included, and as the legal phraseology of these statutes has led to some misconstruction on this subject, as we think, it may not be amiss to examine it shortly.
Statutes most generally are addressed to courts of law, and adapt their phraseology to legal process and legal proceedings; yet courts of equity have at all times been held not to be thereby exempted from the obligatory force of those statutes; and the reason why they were not expressly mentioned, no doubt, was, that the Legislature were well informed of the great maxim in courts of chancery, that Equitas sequitur legem, and with the fact that those courts did conform themselves to the rules of the statute law, *34 acting, as was sometimes said, by analogy to the rules of law, or as others have more accurately expressed it, in obedience to them, except so far only as they are authorized “ by the theory of their jurisdiction, and by their peculiar principles, to qualify those rules.” 1 Swanst. Rep. 341; 2 Sch. & Lef. 630; 1 Ball & Bea. 166, 167; Medlicot v. O. Donnel, 1 Sch. & Lef. 428; 19 Ves. 184; Foster v. Hodgson; Cas. Temp. Talb. 18, 20, n. f.; 2 P. Williams, 753.
This is strongly illustrated by the doctrine of trusts, which constitutes so very large a portion of the jurisdiction of a court of chancery. The trust is a creature of equity, raised and supported by the powers and principles upon which it acts, and is not noticed by a court of law properly; yet, so soon as it is raised, all the rules of law, as applicable to legal estates, are adopted by the Court of Equity and made to govern and direct the trust estate; by all the rules of law, it is meant such as in their nature are applicable to this kind of estate; thus, at law, a cestui que trust could not levy a fine of his estate, and any person interested to defeat it could at any time plead paries finis nihil habuerunt, and avoid it; and although all the expressions in the statute, 4 Hen. 7, are peculiarly fitted and expressive of legal estates, legal claims, entries, actions, &c., yet, in equity cestui que trust can levy a fine, and it will, in all respects, operate as strongly to bar rights, entries, &c., as if he had been seised of the legal estate, — in short, all the provisions of this statute are transferred by the Court of Equity to trusts, and a fine, with five years’ non-claim, is considered as strong a legal bar in that court to a trust estate as it is considered in a court of law to a legal estate. So in the still stronger case of a recovery, where the utmost strictness has obtained in requiring a good tenant to the precipe, who must have a legal estate of freehold in possession ; yet, since the principles upon which a court of equity acts have been more fully developed and freed from the capricious arbitrium formerly attributed to the chancellor, it has been well settled that cestui que trust may suffer a recovery, which shall be as efficacious in cutting off trust estates in tail, remainder, or reversion, as if suffered by the owner of the legal estate. Cas. Temp. Talb. 164; Cruise Dig. Tit. Recovery, ch. 11, § 7 ; 1 Vern. 440; 16 Ves. 224, Lord Greenville v. Blythe; 18 Ves. 418, Wykham v. Wykham.
The statutes of limitation, in their turn, have been the subject of much discussion in courts of equity, but at length their principles, as constituting rules of property,, have been settled to be binding on equitable rights. If those statutes had been penned with a view to anything peculiar to legal rights, then it might have been proper to exclude them from courts of equity, but they rest upon some of those great principles of policy which constitute the. foundation of public prosperity and repose, and consequently must pervade all courts which undertake to examine questions *35 concerning titles and property. The peace of society and the security of titles are as much disturbed by a bill in equity and a decree which takes away the possession of the ancient occupier, as by an action of ejectment at law.
Lord Hardwicke, in Welles v. Sharral, 1 Atk. Rep. 476, expresses the rule with great accuracy; he is speaking of a fine: “ The next consideration is, what effect the fine will have upon the equitable interest ? And no doubt the rules of this Court with relation to fines have been taken by analogy from the rules at law, and the effect is the same with regard to an equitable interest, if of such a nature that turned into a legal interest it would have been barred.”
Lord Chancellor Talbot, in Belch v. Harvey, Sugden’s Vend. Appendix, No, 15, says, a peaceable and quiet possession for a long time, weighs greatly with me in all cases. The foundation which the Court goes on in cases of the like nature with the present is, not any presumption, that after a long space of time the party has deserted his right, but to quiet and secure men’s possessions, “ and for this cause a court of equity has generally acted in conformity to the statute of limitations.” The case before him was an equity of redemption.
In Smith v. Clay, 3 Bro. C. C. 640, in note, Lord Camden gives, with great clearness, both the reason and the rule; Exped.it reipuhlicce ut sit finis litium is a maxim that has prevailed in this Court (chancery) in all times without the help of an act of Parliament; but as the Court has no legislative authority, it could not properly define the time of bar by a positive rule, to an hour, a minute, or a year; it was governed by circumstances. But as often as Parliament had limited the time of actions and remedies to a certain period in legal proceedings, the Court of Chancery adopted that rule, and applied it to similar cases in equity ; for when the' Legislature had fixed the time at law, it would have been preposterous for equity, which by its own proper authority, has always maintained a limitation, to countenance laches beyond the period that law had been confined to by Parliament; and therefore, “in all cases when the legal right has been barred by Parliament the equitable right to the same thing has been concluded by the same bar.”
This case has been supported by a series of decisions made by the most eminent judges; Townshend v. Townshend, 1 B. C. C. 551; 10 Ves. 466, Stackhouse v. Barnston; 17 Ves. 87, Beckford v. Wade; 2 Mer. Rep. 358, Cholmondeley v. Clinton; 19 Ves. 184, Foster v. Hodgson.
We will only quote two other cases ; in Hovenden v.. Annesly, 2 Sch. & Lef. 632, Lord Redesdale says: “ I have looked at a great number of cases for the purpose of seeing how far this rule has been adopted at different times; and I think it impossible not to see that courts of equity have constantly guided themselves by this principle: that wherever the *36 Legislature has limited a period for law proceedings, equity will, in analogous cases, consider equitable rights as hound by the same limitation.”
Lord Manners, in Medlicot v. O’Donnel, says : “ It has been suggested that I lay too much stress upon length of time, and that I attach more credit to it than Lord Redesdale or any of my predecessors. I confess, I think the statute of limitations founded upon the soundest principles and the wisest policy; and that the Court, for the peace of families, and to quiet titles, is bound to adopt it in cases where the equitable and legal title so far correspond, that the only difference between them is, that the one must be enforced in this Court, and the other in a court of law.”
To have quoted so much, and to have referred to so many authorities in support of what may be thought a well-settled question, can only be excused by the doubt which seems to exist with some members of the profession.
Now, Porter’s equitable interest from the sale to the date of his deed was “ of such a nature that turned into a legal interest, the statute would have operated against it.” Therefore it is barred.
It can scarcely be necessary to remark, that in all those cases, as at law, the possession must be adverse, and also that this opinion does not apply to those cases, where there is no correspondent legal title or no legal bar to such corresponding legal title or demand, or where there may have been circumstances of fraudulent concealment of a right of entry from the party.
But this does not occupy the whole seven years; there are still a few days, during which time he was only a judgment creditor. That it was only a few days the plaintiff was in this situation can make no difference, the objection is valid, and if there was one day wanting of the seven years, there would be yet no bar.
If this question rested alone upon the Act of 1715, ch. 27, § 3, which is substantially the same with the statute of 21 James, it would be probably shown that a judgment creditor was barred when the title or possession of tenant was adverse. The Supreme Court of the United States in the case of Ricard v. Williams, 7 Wheat. Rep. 119, has decided that although the rights of a creditor, when he may subject land to sale, cannot strictly be called a right of entry, yet, that upon principles of reason and policy, and by analogy to the right of entry, such powers should be extinguished by the statute, and we do agree fully with the reasoning by which this conclusion is obtained.
Our Act of 1797, ch. 43, § 4, is much more general and unlimited in its expressions. It enacts, “that in all cases where any person or persons shall have had seven years’ peaceable possession of any land, by virtue of a grant or deed of conveyance founded upon a grant, and no legal claim by suit in law, by such set up to said land, within the above said term, that *37 then and in that case, the person or persons so holding possession as aforesaid, shall be entitled to hold possession in preference to all other claimants such quantity, &c. And any person or persons, who shall neglect for the said term of seven years from the time of such peaceable possession having been obtained, to avail themselves of the benefit of any title or legal claim which he, she, or they have to any lands within this State, shall, and is hereby, declared to be forever barred.”
The statute operates in confirmation of the title of the possessor who has seven years’ peaceable possession by virtue of a grant, or deed founded on a grant; it does not operate against any particular description of legal title, but validates and makes indefeasible the title of the tenant; and consequently extinguishes and defeats all claims, powers, and encumbrances existing by “force of any cause or matter had or made before” such peaceable possession having been obtained, and to which seven years’ possession is adverse.
Note. The opinion which Judge Haywood was prepared to deliver in the preceding case was as follows: —
In March, 1808, Porter obtained judgment against William Cocke. A fieri facias issued, and was levied on the lands in question. The sale was delayed by injunction, which, in September, 1808, was dissolved. A ven-ditioni exponas issued on the 23d of September, 1808, and an alias vendi-tioni exponas from March, 1809, returnable to September, 1809 ; upon this the land was sold to Porter. The administrators of Yancy obtained judgment against him in May, 1808, upon which a fieri facias issued in August, 1808, upon which this land was sold in November, 1808, and was purchased by Thomas Cocke, a son of the defendant, who then lived with him upon the land. It was worth six thousand dollars, and was purchased for ten dollars. The sheriff’s deed to Porter was dated the 16th of August, 1816. The judgment of Yancy’s administrators was for a just debt. At the time when execution issued upon Yancy’s judgment, Cocke, the defendant to that action, had personal property much more than enough to satisfy it, but consented that the execution should be levied on the land. John Cocke, a son of William Cocke, purchased the judgment of Yancy’s administrators, and had the direction of the execution. His father was indebted to him for moneys paid for the latter, to the amount of eleven thousand dollars. The money which Thomas Cocke purchased with was his own, made by the sale of cider which belonged to him. William Cocke and Thomas Cocke have remained in possession ever since; first, the father, and when he left the possession, it was continued by Thomas Cocke, his son. On the 4th of October, 1808, the attorney of Porter agreed with William Cocke to take lands on Cumberland, 3,940 acres at seventy-five cents per acre, one half towards satisfaction of another judg *38 ment, and one half towards the satisfaction of this judgment, which latter amount was entered on the execution as so much paid. This agreement John Cocke subscribed as a witness. And then execution issued for the balance, for which the land in question was sold to Porter. On the day of the sale to Thomas Cocke, Hopkins, a creditor was there, and intended to bid; and had some money, and inquired of the sheriff whether, in case of a purchase by him, he would receive the money he had, and credit him a short time for the balance, to which the sheriff assented. Hopkins then applied to the defendant in the execution, who said that he had given the land to his son Thomas, and wished him to have a sheriff’s deed, also adding, that if Hopkins would go home with him he would pay to him the debt he owed him, whereupon Hopkins declined to bid, which, but for what the defendant said, he would have done. The judge of the Circuit Court in charging the jury instructed them, that the judgment of Porter was a lien to prevent a sale by the defendant, but was not a lien against the execution of another creditor under which a sale of the sheriff would be good. He said further, that fraud must be proved; that if Thomas Cocke had been guilty of a fraud in procuring the sale to the prejudice of the plaintiff, the sale to him would be void; but he was not answerable for a fraud of the like kind, imputable to William Cocke, the defendant in the execution, in which he, Thomas Cocke, was not united. If Thomas Cocke was free from fraud, the sale to him was good, and that he could not be affected by the conversation between Hopkins and William Cocke, if not a partaker therein. The jury found for the defendant. A new trial was moved for and refused, and judgment was given for the defendant. And now the question is, whether a new trial should have been granted or not.
Three things are'objects of sedulous anxiety in the law.
First, that judgments rendered should not be defeated, but take effect.
Secondly, that sales by execution issued from 'courts of justice, should be valid and not illusory.
Thirdly, that uniformity of decision should be preserved. A sound decision must avoid encroachment upon any of these objects. .
First; judgments of courts of justice must not be defeated, but take effect.
The defendant must not have power to render the judgment against him of no avail, by withdrawing his property. After authority given by fieri facias to the sheriff to sell, the defendant ought not to be permitted to render it unavailable, by selling, pledging, mortgaging, or otherwise disposing of it before seizure. ' For otherwise this would be done in most instances, and the power of the law to do justice to a creditor, would be brought into contempt. Therefore, the fieri facias binds from the test and *39 takes the property subject to it into the custody of the law till justice be done to the creditor. But until authority be given by the law to the sheriff to make sale, the defendant cannot be guilty of any offence against an authority not yet given, and therefore, is at liberty to act as owner. The authority when given extends its influence over the whole territory into which the fieri facias can run; otherwise whilst part satisfaction was about to be obtained in one county, the execution might be rendered ineffectual in every other county to which it has not yet issued. A fieri facias to one county in England from the Court of King’s Bench, binds not only the property in that county but in every other; which shows that the lien is commensurate with the currency of the fieri facias, not limited to the county whither it is first sent to be executed, under the notion that the lien becomes there first notorious, by being in the hands of the sheriff of the county or in his office. If after the date of the fieri facias and before seizure, the defendant remove his personal property into another county, and there sell to a vendee, shall this defeat the execution entirely, and put it in the power of the vendee to say the lien of the execution did riot extend to this county, and therefore, I was at liberty to purchase though I knew of the execution in the adjoining county, from which the goods were removed to avoid execution there ? Could this be tolerated in any country professing to have laws, to enforce the doing of justice by those who would not voluntarily do it ? Whenever a lien is created' it fixes upon all the property which can be reached by an execution issued from the Court which gives the judgment. Shall we say at this day that a judgment in the federal court shall bind all the lands in East or West Tennessee, though of later date than one in a State court, and shall lake all the property of the defendant except that which shall be in the county to which a State execution first issues ? Why give such preference to federal judgments to the detriment of creditors in our own country ? Is the lien suspended by an injunction obtained by the defendant after the date of fieri facias? It is imperative upon the plaintiff; it affects him personally; he is commanded not to proceed; if, notwithstanding, he does proceed, he is guilty of a contempt and will be ordered to put all right; but the fieri facias by the English law is in no wise affected. A court of chancery can neither reverse, set aside, or suspend judgment or execution directly. A court of record is of higher dignity than one which is not so. Its records are of higher solemnity than proceedings which are not of record; such as the proceedings of a court of chancery. Admitting it to be correct that the lien ceases when the plaintiff cannot have execution without a scire facias and judgment upon it, that the plaintiff may have execution, yet after injunction the plaintiff may sue out execution without a scire facias ; 2 Burrow’s Rep. 660; and so if execution be suspended for a time by consent of parties, it may at the expiration of that time, issue without a scire *40 facias; 6 Mod. 288; 1 Salk. 322, Ba. Ab. Execution. 2 Saund. 72, f. Thence it follows that the lien of a fieri facias is not affected by an injunction issued after its date. And for another reason also, as some suppose, namely, that the defendant must deposit the money before he can obtain an injunction, which must of necessity discharge the lien. But that this is not invariably required, is proved by the case cited from 2 Burrow, 660, for how could the question arise there, whether fieri facias could issue without scire facias, after the dissolution of an injunction, if the money were already deposited in the office ? The law is sfdd to be different in this country, because our courts of equity are courts of record, and -therefore, can act upon the. fieri facias itself. To this it may be answered that a writ of error or supersedeas will only stop an execution not begun to be executed; or in other words, before seizure, but not after, because the property seised may be liable to perish by keeping, or to be consumed by the expenses of keeping. There is the same reason for selling property seised before the injunction issues. If it perish by keeping, the loss must fall on either the plaintiff or defendant, and to prevent this the law says the officer must sell. If the money be deposited, the sale ought not to be made. If a bond be given to indemnify the plaintiff, it will not have precisely the same effects as money deposited, for in the latter case upon a dissolution, the plaintiff takes the money out of court and a new fieri facias can never issue. But in case of a bond deposited a new fieri facias does issue. The goods are redelivered to be disposed of by the defendant to prevent the spoiling of them. In place of selling them as the law of England directs, our law takes bond and security, which may be eventually resorted, to, if the personal estate be wasted in the mean time. Upon a dissolution of the injunction, a new fieri facias issues and binds all the property remaining in specie, and which, because of its perishable nature, has not been of necessity disposed of to prevent its spoiling. In the case of .real estates the law is not in all instances precisely the same as in personalty. Beal estate was bound by the statute for introducing the elegit, from the time of the judgment, by construction which the judges put upon that statute. After it was concluded that the lien should be fixed to the time of the judgment, the elegit was so framed as to carry that conclusion into effect, and the sheriff was commanded to extend also all the lands which the defendant had on the day of the judgment rendered or at any time since. It is incorrect to say that lands are bound because the elegit is framed with a retrospect to the judgment, for the elegit is so framed because of the lien from .the time of the judgment, which without such retrospect could not be rendered efficient. The lien of the judgment is independent of the elegit, and anterior to it. Then came the act for selling lands by fieri facias, which did not intend to alter the lien, being made for the benefit of creditors, and in no respect to their disadvantage. The Leg *41 islature must have intended that this lien should be the same whether the execution chosen by a creditor was a fieri facias or an elegit; for otherwise* in colonies where the elegit was not used, being utterly unproductive, as it was with respect to all uncleared lands,'or the greater part of them at least, and where the fieri facias was the only process which could be used effectually, there would be no lien between the time of the judgment rendered and the date of the fieri facias, a mischief to creditors of too much ■moment to be introduced by a law professing to advance their remedies. The lien was, therefore, preserved. The existence of the lien, from a time anterior to the date of the fieri facias, is recognized by the Act of North Carolina, 1789, ch. 89, § 3, where the heir shall sell, alien, or make over, the lands descended to him before action brought or process sued out against him, he shall answer the value to the creditor of his ancestor. But what if he sell after action commenced or process sued out against him ? Such lands are bound by the judgment which relates to the day of commencing the action, and may be taken and sold by the fieri facias. The same lien and relation was at the common law ; Carth. 245, 246, B. n. c. Heir and Ancestor, f, and the lien was not changed by making the lands vendible by the authority of a fieri facias. If the process meant in the Act of 1789, be process of scire facias founded upon a judgment against the executor, the argument still proves the relation of the fieri facias to a time anterior to its test. .If founded upon a judgment against the ancestor, it relates to that time ; if upon a judgment against an executor, it once related to the time when that judgment was rendered, and after a scire facias, execution of that judgment issued upon it; 1784, ch. 11, § 2. The lien was altered by 1789, ch. 39, § 3, to the time of process sued out against the heir; and where a judgment is given against one who is not heir and in his own proper right, there, too, the lien has been' acknowledged by act of Assembly; 1799, ch. 14, § 2 ; where the execution is restrained for the benefit of purchasers after the judgment to the limits of twelve months from the time of rendition, within which time also, sale must be made. And how was this law of any use or effect, if before it there was no lien upon it after the year which overreached a subsequent purchaser ? Here too during the continuance of any unjust obstacle interposed by the procurement of the defendant, the lien is not effected, but the twelve months must be computed with reference to the time of such continuance ; so that if execution be suspended, the lien shall continue after the discontinuance of such suspension. It is, therefore, hardly susceptible of doubt but that judgment given in a court of record is a lien upon lands from the time of such judgment, if rendered against one in jure proprio, and not in a representative character, because of property coming to him from the debtor. And it is in the next place to be ascertained whether such lien be discharged by an injunction ? Personalty seised in execution *42 must either be sold or redelivered when the injunction issues, to avoid the destruction which follows its perishable nature, such as fruit, cider, fattened hogs, or stalled beeves, and the like, which when redelivered, must be immediately disposed of, and which, therefore, ought not to be overreached in the hands of a purchaser. But the same necessity does not require the redelivery of lands, nor the extinguishment of the lien upon them. They are not so seised as to be taken out of the possession of the defendant, nor is possession delivered to the purchaser upon the sale. The seizure or selection for sale only identifies the property intended to be sold. The injunction suspends the sale, but no redelivery is necessary to prevent the land from perishing; therefore, it remains as it was, and the lien continues, and when the injunction is dissolved,'a venditioni exponas issues, the property being considered in the hands of the sheriff, and not a new fien facias as in the case of personalty. Such was the process used on this occasion, and it was agreeable to common practice. If the land should be discharged of the lien by suspension of the sale, the consequence would be that every defendant by getting an injunction, might give preference to whatever creditor he pleased, and might at pleasure defeat whoever he pleased. And certainly the law has never given to a defendant this privilege. It has fixed his liabilities and the'rights of his creditors upon surer foundations, and has placed those rights far above his control. Is this lien of Porter’s judgment and the sale upon it of less consideration in law than an intermediate sale upon another execution ? Land sold by execution is not delivered to the purchaser. He takes it subject to all encumbrances. He stands in place of the defendant and is liable to the same disadvantages in respect of the land, that he was ; one of which is in the present instance, the lien of Porter’s judgment to which in the act of purchasing, and in the deed which he accepts for all the title and interest of the defendant, he agrees to submit and be subject. For what reason shall the lien be suspended ? Because the money is deposited ? Ho. Because the lands would perish if not redelivered ? Ho. For what then ? Why for no reason at all. The lien, therefore, does continue, notwithstanding the injunction, and no new fieri facias is necessary upon its dissolution. I do not know that the practice has been general to require a bond upon the granting of an injunction against a fieri facias for the satisfaction of which lands are selected for sale by the sheriff. Was the lien done away by the injunction before it was the practice to require a bond? What then shows an alteration of the law since the practice began ? The rule is now precisely the same as before ; where is the law that has done it away ? In the case of personalty, the vendee, under the new execution, is preferred, because the property is sold absolutely as the property of the defendant. In the case of realty, such right as the defendant has is sold. The purchaser is left subject to all others. In the case of personalty the plaintiff *43 lias remedy against the sheriff for an illegal preference given to the younger execution. In the case of realty the plaintiff has no such remedy, having only sold the defendant’s right and title, such as it is, and whatever it be. In the case of personalty the plaintiff is indemnified by action against the sheriff, the evil doer; not so in the case of realty, because his right still subsists. It follows then that the fieri facias is in place of the elegit, tends as it did, and like it overreaches intermediate sales made by the sheriff upon posterior executions, as well as those made by the defendant himself. This conclusion is not in contravention of the principle that execution sales of personal property ought to be protected, for it interferes not at all with such sales. The conclusion is reconcilable with the solicitude of the law to support execution sales, as well as to support liens which are for the purpose of making effectual the judicial decisions of the country. But can these doctrines be reconciled with the principle which inculcates uniformity of decision? 1 Haywood, 94, 95, 100 ; and 1 Tennessee Rep. Under these decisions we have long acted ; they have been considered as the settled law. Had we not better adhere to them ? They were concurred in by all the judges of North Carolina, and have been referred to as law many years ago, by the judges of this State. We had better, it is said, adhere to them for the sake of peace and quietude, than now overturn them with all the titles which have been acquired under them. Answer, that the lien of a former judgment, will not prevail against a sale made by the sheriff .under a latter judgment, unless the present case can be distinguished from that in 1 Haywood, 94, 95. In that case the fieri facias had not been issued before the injunction was obtained. The particular lands intended to be sold for satisfaction of the judgment had not been selected. The execution after a dissolution was a fieri facias, not a venditioni exponas. Here it appeared by the return of the sheriff of record, that these were the lands selected by the sheriff to be sold for satisfaction of the execution. The venditioni, like the elegit, expressly referred to a period antecedent to the injunction and to the sale, and made the sale upon Porter’s execution relate to it. Of this return the purchaser is presumed in law to have notice, and also that it would be liable to a venditioni in the event of a dissolution of the injunction. Though the law may prefer a sale by execution upon a latter judgment, and the title under it, to the lien of a prior judgment, it does not necessarily follow that it will prefer the same sale to the same judgment made after an execution upon it, and seizure of lands to satisfy it. In the latter instance the plaintiff is restricted to the lands seised by the venditioni, and cannot, for want of a fieri facias, resort to other lands, and is deemed by the seizure to have satisfaction. In like manner as in personalty, the debt is satisfied by seizure to the value of the debt till redelivery be compelled by law ; so in the case of realty, the debt is satisfied by seizure till redelivery be compelled, *44 •which can never take place. The lands and other estate not seised, may be sold to others, either by the defendant or by other executions, if those seised are of value sufficient to raise the debt, in like manner as the personalty not seised is released when the debt is discharged by seizure to the value of the debt.
Not only after seizure to the .value may the residue of the estate be sold by the debtor or by other executions, but even if it remained in specie it could never be reached by execution upon the judgment for the satisfaction of which the land was taken. For the seizure being not defeated, to avoid destruction of the thing seised 'pendente lite, is in the same situation after injunction as before. The sale alone is suspended. And here is demonstrated the excessive injustice of permitting a subsequent execution to pass over the residue unseised, and to fix upon that which is seised. Even admit that a fieri facias may issue upon the prior judgment, if he had no lien upon the lands seised, much less would he have it upon those not seised. And in the interval between the injunction and the new fieri facias the whole may be exhausted by later executions. The sureties in the bond must pay when their reliance was justly placed upon the land seised, and when they justly considered that they stood at least upon ground as eligible as that of a subsequent execution creditor. Are they not better entitled to indemnity from the lands seised than he is, especially too, when there was enough left to satisfy him, which, capriciously, he will not make use of? The present case, then, is distinguishable from that in 1 Haywood, 94, 95, and the distinction is in favor of Porter.
But here he is met by a formidable fact; Porter, by his attorney, suspended the sale upon his execution for six months, the execution at the instance of Yancy’s administrators being then in the hands of the sheriff, which was. a delay to the prejudice of Yancy’s administrators, and postponed Porter’s lien and let in the sale to satisfy the execution of Yancy’s administrators. Salk. 320; L. Bay. 251 ; P. N. P. 66; Tidd, 920; 1 Wilson, 44; P. Ch. 266; 1 Ves. 245, 456. This objection it is attempted to remove by calling in the aid of another fact, which was that John Cocke witnessed the agreement between William Cocke and Porter’s attorney to suspend Porter’s execution till March term, 1809 ; and it is urged that this proves the consent of John Cocke to the suspension, which, therefore, cannot be brought forward by him as a fraud upon- him, — and, certainly, he cannot insist that an act consented to by him is a fraud upon him. The only question then is, whether his signature as a witness is evidence that he knew the contents. Had he drawn the articles he must have been conusant of the contents, but he might have signed as a witness without knowing the contents, though, considering his relation to William Cocke, it is very improbable that he did not know them. It ought to have been left to *45 the jury to say upon that fact whether they would infer knowledge in him or not.
And again, it may be said that here the case differed from those cited in the material circumstance^ that here was property enough left, besides that which had been seised; but in the cases cited there was no such residue.
-On the part of the plaintiff it is contended that the judge ought to have stated to the jury the circumstances distinctly, whence they might infer, if they thought proper, the fact that the execution upon the judgment of Yancy’s administrators was used for the fraudulent purpose of excluding Porter from satisfaction of his execution ; namely, the small price of ten dollars, given by Thomas Cocke, his relation, to the defendant, his living at the time in his family; the consent of the defendant that the lands might be levied on instead of the personalty, the same direction and consent by John Cocke, the owner of the judgment obtained in the name of Yancy’s administrators; fieri facias, under his direction, his standing by at the time of the sale and not attempting to bid more than ten dollars ; the knowledge of John Cocke and of Thomas Cocke, from the return of the sheriff on record, that he has seised these lands for Porter; the injunction obtained by William Cocke, and the bond given by John Cocke, as surety for William in the injunction bond, and of the venditioni exponas issued after the dissolution of the injunction; and notwithstanding all this, the execution of Yancy’s administrators was levied, not on the personalty, but on this land which had been seised and appropriated to the satisfaction of Porter’s judgment. And that the judge ought to have informed the jury, that, if upon consideration of all these circumstances they believed it was a contrivance for such purpose, and that Thomas Cocke was not a stranger thereto but participated in the design, that then they should find for the plaintiff. I am of opinion that he ought to have stated the circumstances, and to have told them, that they might infer fraud from them if, upon consideration, they were satisfied that such was the design of the parties, and that Thomas Cocke was conusant of the design, they might also infer from circumstances.
The circumstances which, are urged as evidence of Thomas Cocke’s knowledge and participation, are the judgment of Porter, the fieri facias, the seizure by the sheriff, and advertisement of these lands for sale, the injunction, dissolution, venditioni exponas, the personal estate of his father, sufficient to discharge the judgment of Yancy’s administrators; the levy of the latter upon the land ; the acquiescence of the father and his submission thereto; the acquiescence of his brother John Cocke, and his not bidding, though present, to raise the price of the land, if this sale prevailed; the mischief which would be done to Porter in defeating his venditioni- ex-ponas, which if he did not know of the agreement he must have believed to be subsisting, and if he knew-not to be subsisting, he must have known of *46 the cause why it was not; namely, the agreement of October, 1808; and if he knew of that, then, also, of the suspension thereby of execution for a limited time, at which time it would again issue. Another circumstance is, his probable knowledge that these notorious encumbrances would deter others from bidding at this sale, and the consequent diminution of price at which the lands must be sold. All these inferences it should have been left to them to make or not, according to their best judgment. The authorities cited: Roberts on Frauds, 589, Dyer, 245, 6, Brook, title Coven and Collusion, 1 Vent. 257, it is also urged, show that perverting the process of law, so as to make it subservient to the promotion of an unfair design to the detriment of a just creditor, is an aggravation of the offence, as it makes it produce an effect different from the object which the law intended to be accomplished by it, and which effect the law reprobates and prohibits. The end itself being illegal, all means to arrive at it are condemned, though such means are proper when used to attain their legitimate end. You shall not do good that evil may -come of it, and that such was the law the jury should have been instructed. I yield to these arguments so far as to think that the law should have been so stated to the jury, that they might apply it to such parts of the case before them as, in their judgment, were fit and proper for the application.
And, as it is probable that the whole law material to this case, and its circumstances may not have been fully stated to the jury, I am of opinion that there ought to be a new trial, to the end that the jury may be fully informed of the inferences which they have a right to make from all these circumstances, if, after duly weighing them, they deem it proper to make such inferences.